IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| BARBARA DUNLAP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 04-03208-CV-S-REL |
| | ) | |
| JO ANNE BARNHART, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER DENYING PLAINTIFF'S CLAIM

Plaintiff Barbara Dunlap seeks review of the final decision of the Commissioner of Social Security denying plaintiff's appeal her application for disability benefits under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401, *et seq.* Plaintiff argues that the Administrative Law Judge (ALJ) erred in finding plaintiff "not disabled" for the period from the alleged onset date of plaintiff's disability through the date of the ALJ decision. Plaintiff states four bases for reversal of the ALJ's decision: (1) the ALJ's reliance upon vocational expert testimony that was inconsistent with the Dictionary of Occupational Titles; (2) the ALJ's failure to consider plaintiff's obesity in determining her residual functional capacity; (3) the ALJ's finding plaintiff's carpal tunnel syndrome and Dequervain's tenosynovitis non-severe; and (4) the ALJ's failure to properly assess the plaintiff's credibility in light of the factors set out in Polaski v. Heckler.

I find that the ALJ properly relied on vocational expert testimony to satisfy Step 5 of the sequential evaluation; the ALJ properly considered plaintiff's obesity as an aggravating factor to her knee disorders; the ALJ did not commit reversible error in

Case 6:04-cv-03208-REL   Document 13   Filed 05/02/05   Page 1 of 45

finding plaintiff's carpal tunnel syndrome and tenosynovitis non-severe; and the ALJ properly assessed plaintiff's credibility.

## *I. BACKGROUND*

On May 22, 2002, plaintiff Barbara Dunlap filed an application for disability benefits, seeking a period of disability commencing August 17, 2001, and disability insurance benefits. Plaintiff's application was denied initially, and plaintiff filed a timely request for an administrative hearing. The hearing was held on August 20, 2003, before Administrative Law Judge (ALJ) Arthur T. Stephenson. ALJ Horne entered a decision on January 5, 2004, finding that plaintiff was not disabled and not entitled to disability insurance benefits. Plaintiff requested a review of the ALJ's decision by the Appeals Council. That request was denied on April 22, 2004. The ALJ's decision therefore stands as the final decision of the Commissioner.

## *II. STANDARD FOR JUDICIAL REVIEW*

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner under Title II. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the

evidence in the record and apply a balancing test to evidence which is contradictory." Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Griffon v. Bowen, 856 F.2d 1150, 1153-54 (8th Cir. 1988); McMillian v. Schweiker, 697 F.2d 215, 220-21 (8th Cir. 1983).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These

regulations are codified at 20 C.F.R. §§ 404.1501, _et seq._ The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.    Is the claimant performing substantial gainful activity?

        Yes = not disabled.
        No = go to next step.

2.    Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

        No = not disabled.
        Yes = go to next step.

3.    Does the impairment meet or equal a listed impairment in Appendix 1?

        Yes = disabled.
        No = go to next step.

4.    Does the impairment prevent the claimant from doing past relevant work?

        No = not disabled.
        Yes = go to next step where burden shifts to Commissioner.

5.    Does the impairment prevent the claimant from doing any other work?

        Yes = disabled.
        No = not disabled.

### *IV.  THE RECORD*

The record consists of the testimony of plaintiff and vocational expert Terri Crawford, in addition to documentary evidence admitted at the August 20, 2003, hearing.

## A. EARNINGS REPORT

The record shows that plaintiff earned the following income from 1984 through 2001:

| **Year** | **Earnings** | **Year** | **Earnings** |
|------|------|------|------|
| 1977 | $2,513.55 | 1990 | $2,169.99 |
| 1978 | 00.00 | 1991 | 8,886.45 |
| 1979 | 00.00 | 1992 | 13,278.39 |
| 1980 | 00.00 | 1993 | 14,550.02 |
| 1981 | 1,882.50 | 1994 | 28,532.82 |
| 1982 | 41.50 | 1995 | 16,431.61 |
| 1983 | 1,190.84 | 1996 | 17,341.89 |
| 1984 | 00.00 | 1997 | 14,346.61 |
| 1985 | 00.00 | 1998 | 6,521.84 |
| 1986 | 00.00 | 1999 | 11,968.36 |
| 1987 | 00.00 | 2000 | 17,421.93 |
| 1988 | 00.00 | 2001 | 7,657.58 |
| 1989 | 00.00 | | |

(Tr. at 44.)

## B. MEDICAL AND DOCUMENTARY RECORDS

Below is a summary of plaintiff's medical records, to the extent they are relevant and legible.

On May 10, 1999, plaintiff was seen by her primary care physician Dr. Eileen Davis for complaints of numbness and pain in the last three fingers of her right hand, as well as in her thumb and wrist area. (Tr. at 268.) Plaintiff was at that time working as a janitor. (Tr. at 268.) On examination, plaintiff had good range of motion and good grip.

5

She had positive Phalen's test[1] where numbness in the last three digits was reproduced with extreme flexion of the wrist. (Tr. at 268.) Dr. Davis assessed plaintiff with right tenosynovitis[2] with carpal tunnel. She put plaintiff in a splint and prescribed Naprosyn 500 mg twice daily. She advised plaintiff that the condition would resolve with rest. (Tr. at 268.)

On May 24, 1999, plaintiff presented again to Dr. Davis for a follow-up on her tenosynovitis. (Tr. at 267.) She stated that her thumb still hurt her, although the braces had helped with her carpal tunnel. (Tr. at 267.) Plaintiff had not been able to wear her braces during the day, but only at night. Dr. Davis administered a cortisone shot and ordered plaintiff not to work that day to rest her hand. Plaintiff stated that the carpal tunnel was much improved and was tolerable. (Tr. at 267.)

On June 7, 1999, plaintiff presented to Dr. Davis for an adjustment of her depression medication. (Tr. at 266.) She also stated on that date that her right thumb continued to give her a significant amount of pain. (Tr. at 266.) Dr. Davis put plaintiff in a plaster splint, and advised her to notify the clinic if it did not seem to help. (Tr. at 266.)

On August 16, 1999, plaintiff presented to Dr. Davis's clinic. (Tr. at 265.) She stated that her tenosynovitis was much improved. Plaintiff had stopped working as a janitor and had started her housekeeping job at Balanced Care. She indicated that she was doing much better with that work. (Tr. at 265.)

On January 12, 2000, plaintiff re-established care with Dr. Thomas McClain, orthopedist, after being released from his care more than two years previously. (Tr. at

_____

[1] Phalen's test is a test for carpal tunnel syndrome in which the wrists are flexed in an inverse prayer position. If numbness and tingling are produced after approximately 30 seconds, the test is positive for carpal tunnel.
[2] Tenosynovitis is an inflammation of the tendon and its enveloping sheath. DeQuervain's tenosynovitis is an inflammation on the thumb-side of the wrist.

6

122.) Dr. McClain treated plaintiff in 1997 for left knee pain, which resulted in plaintiff undergoing an arthroscopy[3] of the left knee. (Tr. at 122-27.) In January of 2000, plaintiff returned to his clinic with an approximate two-month history of recurrence of left knee pain. (Tr. at 122.) This recurrence of pain resulted when plaintiff felt a "pop." (Tr. at 122.) She reported at that time working in a sitting job assembling motor parts as Fasco. (Tr. at 122.) Plaintiff reported receiving a prescription for Naproxen[4] in November, which helped the pain somewhat. (Tr. at 122.) X-rays of plaintiff's knee, dated December 28, 1999, showed mild narrowing of the medial joint space of both knees. (Tr. at 122.) On examination, plaintiff showed no instability symptoms of the left knee. (Tr. at 122.) Dr. McClain found tenderness in the knee joint and no particular restriction of range of motion. (Tr. at 122.) He noted some laxity of a ligament in the knee, but otherwise no abnormality. (Tr. at 122.) He noted an impression of possible synovial impingement[5] in the left knee, rule out medial meniscus tear[6] or extension of the previous tear. (Tr. at 122.) He further noted co-existing mild osteoarthritis of the left knee. (Tr. at 122.) He prescribed glucosamine and chondroitin sulfate, continued Naproxen, and administered an injection in the left knee of Celestone, Marcaine, and Depo-Medrol. He advised plaintiff on quad-strengthening exercises. He did not modify plaintiff's work assignment at that time. He noted a plan to re-evaluate in three weeks, with a recommendation for a repeat arthroscopy if no improvement. (Tr. at 122.)

---

[3] Arthroscopy is a surgical procedure involving the insertion of a thin fiberoptic scope into the joint space to allow direct visualization and repair of internal structures.

[4] Naproxen is a nonsteroidal anti-inflammatory drug used to treat symptoms caused by arthritis, including inflammation, stiffness, and joint pain. It is available over-the-counter in dosages up to 220 mg, and by prescription in higher dosages.

[5] Synovial impingement syndrome is a condition in which the lining of the knee cavity is pinched and becomes swollen and painful.

[6] A meniscus tear is a tear in the cartilage of the knee.

7

On June 28, 2000, plaintiff returned to Dr. McClain's office complaining of persistent pain about the left knee. (Tr. at 121.) Plaintiff reported that the glucosamine and chondroitin sulfate provided very little relief. She indicated that the right knee was also beginning to give her some discomfort. She stated that she twisted the left knee one month previously and felt a pop, and since that time she had experienced a sense of swelling. (Tr. at 121.) Plaintiff reported taking Celebrex 200 mg twice daily as prescribed by Dr. Davis. (Tr. at 121.) Examination of plaintiff's left knee revealed tenderness and moderate laxity. Plaintiff had range of motion to 130 degrees, with some crackling in the knee. (Tr. at 121.) In the right knee, Dr. McClain found mild to moderate tenderness with an occasional click, possible small effusion,[7] and an occasional click. (Tr. at 121.) X-rays showed definite narrowing of the medial compartment of the left knee, and minimal narrowing of the medial compartment of the right knee. (Tr. at 121.) Dr. McClain noted an impression of degenerative arthritis of the left knee medial compartment with chronic ACL[8] laxity, and possible extension of her medial degenerative meniscal tear. He noted probable early osteoarthritis in the right knee with a possible degenerative medial meniscus tear. (Tr. at 121.) He administered a Synvisc[9] injection in the left knee, continued plaintiff on Celebrex[10], and advised plaintiff on quad strengthening exercises for both knees. (Tr. at 121.) He noted a plan to see plaintiff back in his office the following week for administration of a second Synvisc injection in the left knee. (Tr. at 121.)

---

[7] Effusion is swelling caused by excess fluid in the tissues.

[8] The ACL, or anterior cruciate ligament, is a ligament in the knee that is particularly susceptible to injury.

[9] Synvisc is the brand name form of hyaluronate sodium derivative, a compound similar to a substance occurring naturally in joints that acts as a lubricant and shock absorber. Synvisc injections are used to relieve pain caused by osteoarthritis in the knee.

[10] Celebrex is a prescription medication used to relieve the symptoms of arthritis, such as pain, stiffness, swelling, and inflammation.

On July 5, 2000, plaintiff returned to Dr. McClain's office for her second Synvisc injection. (Tr. at 121.) She reported feeling much more comfortable than the previous week. She complained of recurring pain in her right knee, likely due to osteoarthritis, from favoring the left knee. Plaintiff requested something for the pain, and Dr. McClain prescribed Vicodin.[11] He noted that plaintiff was to return to the clinic the following week for a third injection in her left knee. (Tr. at 121.)

On July 11, 2000, plaintiff returned to Dr. McClain's clinic for a third Synvisc injection. (Tr. at 119.) She reported that she believed the left knee was improving. She complained of increasingly frequent episodes of right knee pain and occasional sense of catching in the right knee. Examination of the right knee revealed a focal click and moderate swelling compared to the left knee. Examination of the left knee revealed no swelling and no effusion, with mild to moderate tenderness. Dr. McClain noted an impression of degenerative arthritis in the right knee with a possible degenerative medial meniscus tear. Osteoarthritis in the left knee was responding to Synvisc therapy. He administered the third Synvisc injection in the left knee. He recommended an MRI of the right knee to screen for degenerative medial meniscus tear, and noted a plan to reevaluate in approximately three weeks. (Tr. at 119.)

On July 21, 2000, a physician's note from Dr. McClain indicates that an MRI of plaintiff's right knee revealed a medial meniscus tear, and possible chronic ACL tear. (Tr. at 119.) Inflammation was noted in the knee, consistent with ligament strain, and definite evidence of osteoarthritis. Joint effusion was noted. Dr. McClain recommended that plaintiff consider arthroscopy of the right knee, stating that it would not help with the

---

[11] Vicodin is a brand-name combination medicine containing a narcotic analgesic and acetaminophen, used to treat pain.

arthritis pain much, although it might improve comfort of the knee to eliminate the meniscal tear. (Tr. at 119.)

On January 30, 2001, plaintiff was seen by Dr. Egbert, her family practitioner, with complaints of back pain and pain in both knees. (Tr. at 179.) Plaintiff reported being required to stand at work. The medications reportedly given at plaintiff's last visit on January 25, 2001,[12] were not helping. Plaintiff stated she was run over by her ex-husband and sustained bilateral knee injuries in 1994, which were aggravated by her stand-up job. She stated she was forced to leave her orthopedic surgeon of six years. Plaintiff indicated that Celebrex helped the pain when taken at 400 mg per day. She complained of feelings of depression. On examination, plaintiff had some tenderness of her lower spinal muscles. Plaintiff was referred to Dr. Duncan for orthopedic care. Her Celebrex was increased to 200 mg twice daily. She was restricted to limited duty at work, with no standing. (Tr. at 179-80.)

On February 14, 2001, plaintiff established care with Dr. Douglas Duncan, orthopedist. (Tr. at 161-62.) Plaintiff complained of bilateral knee pain, left a little worse than the right. (Tr. at 161.) She reported her history of knee problems, including problems with her left knee since she was run over by a car in 1994. Dr. McClain performed a left knee arthroscopy in 1997. She decided to see Dr. Duncan for orthopedic care after her insurance changed. (Tr. at 161.) Plaintiff reported that her right knee started bothering her in June of 2000. (Tr. at 161.) In July of 2000, she reported seeing Dr. McClain for her left knee. She could not recall any injury to her right knee, even when Dr. Duncan told her that anything that would tear the ACL would not go unnoticed. (Tr. at 161.) Dr. Duncan asked her why she did not get an arthroscopy on her right knee, as it was not good for her

_____

[12] The notes from that office visit were illegible.

knee to walk around on a torn meniscus. She stated that she would not afford the cost of it at that time. The pain had gotten to the point where she felt something had to be done about it. (Tr. at 161.) Plaintiff reported constant pain localized to the medial knee joint. She had been taking Celebrex and using ice and heat, but that did not control the pain adequately. (Tr. at 161.) Standing, walking, and stair climbing all bother her knee. It swells and gives way. She experienced grating, grinding, and popping sensations in her knees. It interfered in her work and hobbies and was not getting any better. (Tr. at 161-62.) On examination, Dr. Duncan found no ecchymosis,[13] erythema,[14] swelling, or effusion. Alignment was within normal limits. Plaintiff had severe tenderness in both knees. Stability was normal, and she had full range of motion. X-rays showed moderate narrowing of the medial joint space on the left and minimal on the right. (Tr. at 162.) Dr. Duncan assessed plaintiff with complex tear of the medial meniscus of her right knee. He recommended arthroscopy on her right knee and and MRI of her left knee to make sure she did not have internal derangement on that side as well. (Tr. at 162.)

On February 22, 2001, plaintiff underwent an MRI of her left knee, as ordered by Dr. Duncan. (Tr. at 134.) The exam revealed significant abnormalities of the knee, including small to moderate-sized joint effusion, an apparently complete tear of the ACL, which was laying down parallel to the tibia bone, and thinning of the cartilage in the knee.

On February 28, 2001, plaintiff returned to Dr. Duncan's clinic to discuss the MRI findings. (Tr. at 160.) There had been no change in her subjective symptoms. The left knee was still bothersome, although the right knee was the one with the known

---

[13] Ecchymosis is skin discoloration or bruising caused by the escape of blood from ruptured blood vessels.
[14] Erythema is redness of the skin caused by inflammation.

meniscal tear. The MRI did not show any evidence of torn menisci or collateral ligaments. She had a chronic ACL tear on the left, just as she did on the right. The thinning of the cartilage in her left knee was attributed to her previous meniscectomy. Dr. Duncan found no indication for arthroscopy of her left knee. He indicated a plan to proceed with an arthroscopic medial meniscectomy of her right knee. (Tr. at 160.)

On March 9, 2001, plaintiff returned to Dr. Duncan's clinic for a recheck of her right knee post-surgery. (Tr. at 155.) Plaintiff had a normal amount of soreness post-operation. She did not have any complaints with the knee. In the arthroscopy, plaintiff was found to have a severe degenerative tear of the medial meniscus, which was excised. She was also found to have an absent ACL, which was not a surprise. (Tr. at 155.) Dr. Duncan assessed plaintiff as making good progress in her recovery. Plaintiff was instructed on range-of-motion exercises. (Tr. at 155.)

On March 21, 2001, plaintiff returned to Dr. Duncan's clinic for a follow-up. (Tr. at 154.) Plaintiff reported doing very well. The only time she experienced discomfort was if she did a lot of activity. (Tr. at 154.) On examination, Dr. Duncan found no effusion. Plaintiff had full range of motion. He assessed her progress as excellent and advised her to resume activities as tolerated. At that time, plaintiff was laid off and did not have to return to work until some time in May. Dr. Duncan expressed certainty that plaintiff would be ready to return by that time. He advised her to take over-the-counter anti-inflammatory medication as needed and tolerated. If those medications did not resolve any flare-ups, she was to return for an injection. (Tr. at 154.)

On March 13, 2002, plaintiff established care with Dr. Scott Dooley, family practitioner. (Tr. at 142-43.) Plaintiff's chief complaint was arthritis. (Tr. at 143.) Dr.

Dooley noted plaintiff's history of arthroscopy in both knees. She reported a diagnosis of early arthritis mainly in the knees, but in the hips as well. She reported she was previously on Celebrex, but ran out of medicine and could not afford more. (Tr. at 143.) She reported a lot of popping in her knees, and stated that her symptoms were better since her arthroscopies until she ran out of medicine and her weight increased. (Tr. at 143.) She reported being on one other medicine before Celebrex and reported no problems with her stomach. (Tr. at 143.) A review of plaintiff's psychiatric symptoms revealed plaintiff's increased appetite and difficulty sleeping over the previous 2-3 years, tearfulness at times, and easy anger. Plaintiff reported losing her job in August of 2001, and stated she was not looking for work and felt no drive to leave the house. (Tr. at 143.) She reported smoking two and a half packs of cigarettes per day, poor dietary habits, and no routine exercise. On examination, Dr. Dooley found plaintiff had good range of motion bilaterally in her knees and no effusion. (Tr. at 142.) He noted come minor popping with some motions, but otherwise found the examination unremarkable. (Tr. at 142.) He noted an impression of depression and arthritis. He indicated a plan to book plaintiff with an appointment to introduce her to Janet Myers. Plaintiff was unsure if she was interest in psychological treatment. Dr. Dooley indicated he would like plaintiff to see someone. (Tr. at 142.) He indicated he was unsure why plaintiff was not on a standard NSAID drug for arthritis, and prescribed Naproxen, indicating plaintiff could go back to Celebrex or try other medications if there were problems. (Tr. at 142.) Plaintiff had undergone a total abdominal hysterectomy in December of 2001. (Tr. at 143.) Dr. Dooley prescribed estrogen tablets, Naproxen 500 mg per day, and Prozac[15] 20 mg per day.

---

[15] Prozac is a brand-name form of the drug fluoxetine, a medication used to treat mental depression.

On April 29, 2002, plaintiff presented to Dr. Dooley with complaints of bilateral knee pain. (Tr. at 140-41.) She stated that Naproxen helps some, but not much. She reported walking more to lose weight, but stated that she had irritated her knees. Dr. Dooley noted plaintiff's history of arthroscopy in both knees, and her treatment with Synvisc injections in her left knee two years previously. He informed plaintiff that she was too young for a knee replacement. (Tr. at 140.) Examination of plaintiff's knees revealed no popping, some grinding feeling He found some grinding feeling with the valgus stress test,[16] in the left knee greater than the right. (Tr. at 140.) Most of the pain was in plaintiff's right knee, however. Plaintiff consented to steroid injection in her right knee. Dr. Dooley noted that if the steroid injections help, plaintiff may want to consider a referral for Synvisc. He intended to consider a steroid injection in plaintiff's left knee if the pain continued to prevent her from exercising to lose weight. He advised plaintiff to consider water exercise, if possible. (Tr. at 140.)

On July 18, 2002, plaintiff reported to her primary caregiver, nurse practitioner Paula Maize. (Tr. at 195.) She stated that the pain in her hips and knees improved with Vioxx. She indicated that the pain was a little worse that week because she was remodeling her kitchen. Her hips and legs hurt worse at night when she went to bed. (Tr. at 195.) Ms. Maize noted an impression that plaintiff's arthritis was improved. (Tr. at 196.) She had normal range of motion in her back, no obvious deformities of her extremities, and no swelling. (Tr. at 196.) Plaintiff was prescribed Ultracet[17] for short-

---

[16] The valgus stress test is an examination procedure used to test the medial collateral ligament in the knee. It involves stabilizing the patient's thigh and applying gentle stress on the ankle. The test is performed both with the leg fully extended and with 30 degrees flexion.

[17] Ultracet is a combination medication containing opiate analgesics and acetaminophen.

Case 6:04-cv-03208-REL   Document 13   Filed 05/02/05   Page 14 of 45

term treatment of increased pain. Ms. Maize advised that she would not refill that medication.

On August 15, 2002, plaintiff returned to see her nurse practitioner Ms. Maize. (Tr. at 201.) She reported continuing significant knee pain, stating that the Vioxx was helping but not completely. She wondered what else could be done. (Tr. at 201.) Plaintiff discussed weight loss and expressed a desire to see if losing weight would decrease her knee pain. (Tr. at 201.) Plaintiff was referred to a pain clinic to see if they could improve her pain control. (Tr. at 202.) She was also referred to Weight Watchers, and advised to try lifestyle modification to avoid lipids. (Tr. at 202.) Plaintiff had two toenails excised for an unrelated problem and Ms. Maize prescribed her Ultracet for pain relief following that surgery. (Tr. at 202.)

On September 18, 2002, plaintiff was seen by Dr. Duncan for recurrent bilateral knee pain. (Tr. at 151-52.) At the time of this office visit, plaintiff was prescribed Vioxx 25 mg daily, Premarin .9 mg daily, and Hydrochlorothiazide 25 mg daily. (Tr. at 151.) Dr. Duncan noted that he had performed an arthroscopy on plaintiff's left knee on March 8, 2001. Plaintiff reported undergoing an arthroscopy on her right knee by Dr. McClain. She reported being administered Synvisc and steroid injections in her left knee by Dr. McClain prior to her left knee arthroscopy. She stated that those injections did not help her, and so she was discouraged from trying them again. (Tr. at 151.) Dr. Duncan noted that plaintiff had a torn meniscus at that time, and that the injections could not be expected to help in the presence of a torn meniscus. (Tr. at 151.) Plaintiff reported that the pain "right now" was very disabling for her and that she could not walk very far because of the pain. She reported being unable to get a job. (Tr. at 151.) On examination,

plaintiff's range of motion bilaterally was 0-120 degrees. She had some mild medial laxity and some tenderness over the joint line. Dr. Duncan found no effusion. (Tr. at 151.) X-rays of the knees showed complete loss of the medial joint space on the right knee and near complete loss on the left. There was some lateral tilting of the kneecap. At the time of the arthroscopy the year before, the kneecap was well aligned with the center of the groove. There were no obvious degenerative changes on the lateral views. (Tr. at 151.) Dr. Duncan assessed plaintiff with bilateral medial compartment degenerative arthritis, right worse than left, with complete loss of the medial aspect of the medial compartment on the right. (Tr. at 151.) Dr. Duncan noted that plaintiff was only 41 years old. He explained to her the disadvantage and hazards of doing a joint replacement at that age and told her that she would probably have to have a revision or two sometime in the future. (Tr. at 151.) He recommended steroid injections, with the expectation that they would work better than when she was being treated with the presence of a torn meniscus. (Tr. at 152.) If the steroid injections failed to work, he indicated that another try of Synvisc would be appropriate. He indicated a plan to put off joint replacement in a 41-year-old as long as they could. Plaintiff stated she wanted to proceed with injections. (Tr. at 152.) Dr. Duncan administered steroid injections in each knee. He also recommended that plaintiff take two Tylenol three times per day to supplement the Vioxx. Plaintiff was to return to the clinic in three or four weeks if she had persistent pain. (Tr. at 152.)

On October 8, 2002, plaintiff returned to Ms. Maize's clinic, stating that the pain in her knees was getting worse. (Tr. at 213.) She reportedly went to see Dr. Duncan and was very dissatisfied with his care. Plaintiff stated that Dr. Duncan injected her knees with cortisone and told her that he could not do any more for her except Synvisc or total

knee replacements. She stated that she had already tried Synvisc without success. Plaintiff stated that the cortisone injections did not help. (Tr. at 213.) Plaintiff reported attending physical therapy and talking to the therapists about several different therapies that could be tried. (Tr. at 213.) Ms. Maize referred plaintiff to physical therapy for a total of 12 visits. (Tr. at 216.)

On October 16, 2002, plaintiff reported for an initial evaluation in physical therapy. (Tr. at 298.) Plaintiff stated she was experiencing a pain level of 9 out of 10 in both knees. (Tr. at 298.) She revealed that she had had a number of treatments in her knees, including cortisone shots and Synvisc injections. (Tr. at 298.) She reported no relief from the injections. (Tr. at 298.) Plaintiff stated that her goals were to decrease her knee pain and increase knee function. She wanted to prolong the time before she will have to have knee replacement surgery. She also indicated that she would like to be able to exercise for weight control. (Tr. at 298.) On examination, plaintiff displayed active range of motion within functional limits throughout her lower extremities. (Tr. at 299.) The therapist found swelling in both knees, and decreased strength in both knees. (Tr. at 299.) The long-term goals, to be achieved within three to four weeks, were stated as decreasing her pain level to 3 to 4 out of 10; walking with a more symmetrical gait pattern; being fitted for knee braces; and displaying within functional limits strength in both legs. (Tr. at 300.)

On October 22, 2002, at the request of plaintiff's physical therapist. Ms. Maize ordered plaintiff to begin aquatic therapy. (Tr. at 217-18.)

On October 24, 2002, at the request of plaintiff's physical therapist, Ms. Maize ordered an unloader brace for plaintiff's knee to help with pain. (Tr. at 219.)

On November 6, 2002, plaintiff returned to see Ms. Maize. (Tr. at 220.) She reported that the physical therapy was causing increased pain in her knees. She was doing daily physical therapy in addition to water therapy three times weekly. At the time of this office visit, she had cut back and was only seeing the therapist. (Tr. at 220.) Plaintiff was waiting for the knee brace for the right knee to arrive. If that helped, Ms. Maize indicated they would get one for her left knee. (Tr. at 220.) Plaintiff reported that her depression was better and that she had not taken Prozac for several months. (Tr. at 220.) Ms. Maize noted an impression that plaintiff's knee pain and arthritis had deteriorated. (Tr. at 220-21.) She prescribed Ultracet as needed for pain. (Tr. at 221.)

On February 5, 2003, plaintiff returned to Ms. Maize's clinic. (Tr. at 226.) She had received her knee stabilizer braces and reported that they were really helping a lot. (Tr. at 226.) Plaintiff requested a steroid injection to help decrease the pain in her right knee, because she had to send that knee brace back for re-fitting. (Tr. at 226.) Ms. Maize prescribed Ultracet as needed for pain. (Tr. at 226.)

On March 3, 2003, plaintiff was discharged from physical therapy. (Tr. at 230.) It was noted that "all goals [were] achieved." (Tr. at 230.)

On August 4, 2003, plaintiff returned to Ms. Maize's clinic. (Tr. at 244.) Her weight had increased to 216 pounds with her knee braces on, although plaintiff admitted that she had gained some weight. (Tr. at 244.) Plaintiff reported that her knees had been bothering her quite a bit. She was reportedly unable to stand or walk for more than a short period of time or short distances. (Tr. at 244.) Plaintiff was prescribed Ultracet as needed for pain. (Tr. at 246.)

## C. ADMINISTRATIVE RECORDS

Below is a summary of plaintiff's administrative records, to the extent they are relevant and legible.

### 1. Plaintiff's Self-Reported Statements

On May 21, 2002, plaintiff completed a Disability Report–Adult. (Tr. at 63-72.) She reported that the conditions limiting her ability to work were here legs, her knees, and surgeries. (Tr, at 64.) These conditions cause plaintiff pain, and first bothered her in 1997. (Tr. at 64.) Plaintiff stated she became unable to work because of her conditions on August 17, 2001. (Tr. at 64.) Her condition caused her to make changes in her attendance at work; she reported that her knees and legs would keep her up at night, which would cause her to miss work. (Tr. at 64.) Plaintiff stopped working on August 17, 2001 because her legs bothered her too much. (Tr. at 64.) Plaintiff reported three jobs in the 15 years prior to her alleged onset date. (Tr. at 65.) She worked from 1991 through 1997 as a janitor for a factor, from 1998 through 1999 as a housekeeper for a hospital, and from 1999 through 2001 as a small motor assembler. (Tr. at 65.) Plaintiff completed ninth grade in special education classes. (Tr. at 70.)

On June 4, 2002, plaintiff completed a Claimant Questionnaire. (Tr. at 81-84.) Plaintiff stated that she experiences symptoms including aching, cramping, and grinding when she walks, and popping all the time. (Tr. at 81.) The symptoms reportedly keep plaintiff awake at night and give her a lot of pain. (Tr. at 81.) A number of activities make plaintiff's symptoms worse, including climbing stairs, walking, and standing still. (Tr. at 81.) Plaintiff reported that when she gets on her knees, she has a hard time getting back up. (Tr. at 81.) She also indicated that her back hurts all the time because of the

accommodations she makes for her knees. (Tr. at 81.) Her symptoms bother her all the time. (Tr. at 81.) Other than medication, plaintiff will also put an over-the-counter ointment on her knees four or five times a day, which reportedly does not get rid of the pain but helps. (Tr. at 81.) At the time plaintiff completed the questionnaire, she was taking Aleve[18] and naproxen 1000 mg for her knee pain. (Tr. at 81.) She reported that the pain medication made her sick to her stomach. (Tr. at 81.)

Plaintiff stated that she was no longer able to work, that it hurts to stand or walk for very long at a time. (Tr. at 82.) She also stated that if she sits too long, her legs will cramp and go to sleep. (Tr. at 82.) Plaintiff indicated that she has difficulty sleeping because of the pain in her legs (Tr. at 82.) She stated that she applies an over-the-counter ointment to her legs after a hot bath and that helps her sleep for a little while. (Tr. at 82.) Her self care has changed in that she no longer curls her hair because she cannot stand up to dry it and style it. She also reported being afraid of falling in the shower when her knees lock up. (Tr. at 82.) She reported cooking simple meals, such as lunch meat, hamburgers, hot dogs, and "TV dinners." (Tr. at 82.) She stated that when her live-in boyfriend was home, he cooks meals. (Tr. at 82.) Plaintiff stated that she does not cook anything that takes very long to prepare because it makes her knees hurt. (Tr. at 82.) She stated that she has difficulty following directions because she cannot read or spell. (Tr. at 82.) She stated that she does not "pick up things too fast." (Tr. at 82.) Plaintiff indicated that she does not do shopping, that her boyfriend and children do the shopping for her. (Tr. at 82.) She stated that she does not do household chores like she used to because of the pain in her legs. Her two sons live with her and clean the house for her. (Tr. at 82.)

---

[18] Aleve is a brand-name over-the-counter nonsteroidal anti-inflammatory drug (NSAID) used to relieve symptoms caused by arthritis, including inflammation, stiffness, and joint pain. Aleve contains the active ingredient naproxen sodium.

Her sons or her boyfriend do the vacuuming, dishes, laundry, and dusting. (Tr. at 83.) Plaintiff indicated that she has no hobbies, that she does not watch television or listen to the radio, and that she does not read books or magazines well. (Tr. at 83.) She has a driver's license, but does not drive often because it hurts her to press the brake. (Tr. at 83.) She is unable to drive a stick-shift. She indicated that she goes out of her home once or twice a week, that she drives herself about 20 miles to the doctor, and that her son sometimes takes her to visit her mother. (Tr. at 83.) She stated that her difficulty in climbing stairs limits her ability to leave the house. (Tr. at 83.)

Plaintiff reported a change in her mood and relationships with her family because of her negative feelings about being unable to take care of herself. (Tr. at 84.) She reported going to church on Sundays with her son. (Tr. at 84.)

### 2. Plaintiff's School Records

Included in the record are examples of plaintiff's educational records from grade school through high school. (Tr. at 92-95.) The records indicate that plaintiff was in special education through all levels of her education. (Tr. at 92-95.) Her elementary school test record indicates that two math tests were read to her. (Tr. at 94.)

### 3. Psychiatric Review Technique

On July 25, 2002, Dr. Rod Cannedy, PhD, completed a psychiatric review technique on plaintiff's behalf. (Tr. at 96.) Dr. Cannedy indicated that plaintiff had impairments not severe in category 12.04 Affective Disorders. (Tr. at 96.) Nothing is marked on the section of the form dealing with affective disorders. (Tr. at 99.) Under the consultant's notes, Dr. Cannedy indicated that plaintiff reported attending special education classes. The doctor noted that plaintiff reported being unable to read or spell,

but that she was able to complete the form concerning her activities of daily living. (Tr. at 108.) Dr. Cannedy noted that on March 13, 2002, plaintiff admitted to Dr. Dooley that she had a depressed mood and was on Prozac. (Tr. at 108.) He indicated that she does not report any limitations due to her impairment. (Tr. at 108.)

*4. Physical Residual Functional Capacity Assessment*

On July 24, 2002, Dr. Vincent Previti, M.D., completed an assessment of plaintiff's physical residual functional capacity. (Tr. at 110-17.) Dr. Previti assessed a primary diagnosis of osteoarthritis of the knees and a secondary diagnosis of obesity. (Tr. at 110.) He assessed plaintiff with the following exertional limitations: ability to occasionally or frequently lift 10 pounds; ability to stand or walk for a total of at least 2 hours in an 8-hour day with normal breaks; ability to sit for a total of 6 hours in an 8-hour day with normal breaks; and an unlimited ability to push or pull, other than the limitations for lifting and carrying. (Tr. at 111.) Dr. Previti noted that plaintiff was then a 41-year-old woman with obesity, height of five feet, five inches, and weight of 199 pounds. (Tr. at 111.) He noted her allegations of pain in her knees, legs, and back, making reference to plaintiff's surgical history in both knees and the results of recent exams and injections on March 29, 2002. (Tr. at 111-12.) He indicated that plaintiff was taking Naproxen 500 mg twice daily for pain, with some relief. (Tr. at 112.) He further noted that plaintiff attributed her back pain to her need to adjust for her knee pain. (Tr. at 112.)

Dr. Previti assessed plaintiff with postural limitations in that she could only occasionally climb, balance, stoop, kneel, crouch, or crawl. (Tr. at 112.) He assessed no manipulative, visual, or communicative limitations (Tr. at 113-14.) He indicated that

plaintiff should avoid concentrated exposure to vibration and hazards such as machinery and heights, stating that vibration may exacerbate arthritis pain in her knees and that the hazards limitation arose from her possible limited mobility. (Tr. at 114.) Dr. Previti concluded that the pain in plaintiff's knees and legs is attributable to osteoarthritis of her knees. (Tr. at 115.) Based upon the medical examiner's report, plaintiff's activities of daily living, and the fact that plaintiff reported "walking to lose weight," Dr. Previti found plaintiff's allegations to be partially credible, as reflected in the reduced residual functional capacity. (Tr. at 115.)

### 5. Statement of Treating Source

On May 5, 2003, plaintiff's treating medical professional, nurse practitioner Paula Maize, submitted a letter to Pharmacia Patient's In Need Foundation, a patients' assistance program providing up to six months of free medication based on financial and medical need. (Tr. at 241.) In this letter, Ms. Maize stated that "to the best of my knowledge, Barbara [Dunlap] is not able to be employed due to osteoarthritis and currently does not have any income." (Tr. at 241.)

### D. SUMMARY OF TESTIMONY

At the August 20, 2003, administrative hearing, plaintiff and Vocational Expert Terri Crawford testified.

### 1. Plaintiff Barbara Dunlap

At the time of the hearing, plaintiff was 42 years old. (Tr. at 309.) She was five feet, five inches tall and weighed 214 pounds, stating that she usually weighed less but had put on a lot of weight since she was unable to move around. (Tr. at 309.) Plaintiff finished ninth grade in school. (Tr. at 315.) She was in special education. (Tr. at 316.)

She was 16 years old when she quit school, and she stated that she can read basic words like "the" and "and." (Tr. at 316.) She cannot read the newspaper. She reads part of it, but stated that there are a lot of words that she does not know. (Tr. at 316.) Plaintiff's sister helped her read the correspondence from the Social Security Administration. (Tr. at 316.) Her sister also helped her fill out her Disability Report. (Tr. at 324.) Plaintiff could not do a job that required her to read because, for example, if she had to read people's names, she would not be able to read them. (Tr. at 325.) She has never done any work requiring her to read. (Tr. at 325.)

Plaintiff lives with her fiancé and two adult sons. (Tr. at 310.) Her fiancé and sons do most of the housework, although plaintiff tidies up some, starts the laundry and folds it, cooks meals, and washes dishes. (Tr. at 311.) Her younger son does the grocery shopping. (Tr. at 312.) If she goes to Wal-Mart, she rides in the electric cart or leans on the grocery cart. (Tr. at 337.)

Plaintiff has a driver's license and is able to drive, although it hurts her legs to push on the brake. (Tr. at 312.) Plaintiff wears knee braces and stated that they relieved a lot of the pressure in her knees when she was up and moving around. (Tr. at 315.) She wears them all of the time, except when she is lying down. (Tr. at 315.) She does not use any kind of cane, crutches, or walker. (Tr. at 315.)

Plaintiff alleges an onset date of August 17, 2001. (Tr. at 317.) On this date, the factory where she worked put her on the night shift and required her to stand up for eight hours. She had to lift and carry rotors, which weigh 60 to 70 pounds. (Tr. at 317.) Plaintiff was unable to do this work because of the pain. (Tr. at 318.) Her back would not lift it, her hands would give, and her legs could not take the weight. (Tr. at 319.)

Plaintiff worked at the factory from 1999 until her alleged onset date. (Tr. at 321.) From 1998 until 1999, she worked in housekeeping at a hospital. (Tr. at 321.) From 1991 until 1997, she was a janitor. (Tr. at 321.) Plaintiff started working outside the home in 1991. (Tr. at 322.) From 1990 until 1991, she worked as a cashier in a gas station and convenient store. (Tr. at 322.) She did not have any knee problems at that time. (Tr. at 322.) Before 1990, plaintiff was married and did not work outside the home. (Tr. at 323.)

Plaintiff alleges problems with her upper extremities and hands, beginning during her period of working at the factory Fastco. (Tr. at 327.) Her hands would swell badly and she had to have rings cut off at work. (Tr. at 327.) Her hands would go to sleep at night. Her doctor Eileen Davis said she had carpal tunnel syndrome. (Tr. at 327.) Dr. Davis prescribed Celebrex and administered a cortisone shot in her hands. (Tr. at 328.) She also put a splint-like brace on plaintiff's right hand. Plaintiff missed a few days of work because of her hands. (Tr. at 328.) Se stopped having problems with her hands when she quit work. (Tr. at 334.) Her hands will still go to sleep on her sometimes. (Tr. at 334.) At the time of the hearing, plaintiff had not been to the doctor for pain in her hands since she was dropped from Medicaid in April of 2002. (Tr. at 334.)

While plaintiff was working at Fastco, she had surgery on her right knee. (Tr. at 328.) Prior to working at Fastco, she had surgery on her left knee. (Tr. at 328.) Both surgeries were for ACL tears. (Tr. at 328.) Plaintiff stated that she also has a permanent crack in her left knee. (Tr. at 328.) Plaintiff was able to do the work at Fastco, even after the surgery on her left knee. (Tr. at 329.) Plaintiff was diagnosed with the ACL tear in her right knee in July of 2000, but did not have surgery to repair it until March of 2001. (Tr. at 330.) She continued to work during that time, but states that she had a lot of problems

and missed a lot of work. (Tr. at 330.) Se was off work two months for the surgery. (Tr. at 331.) After the surgery on her right knee, plaintiff worked in a sit-down position for a while, and then she would stand and test motors. (Tr. at 331.) About four months later, her employer put her in a standing position and had her building rotors. (Tr. at 331.) Plaintiff got the factory job in a lucky break, because she had no factory experience. (Tr. at 331.) Her employer let her work for a 90-day probationary period, and read her the hiring exam. (Tr. at 332.)

Plaintiff also alleges problems with her back and hips. (Tr. at 332.) She takes an anti-inflammatory for her legs and hips. (Tr. at 333.) She has never injured her back to her knowledge. (Tr. at 333.)

Plaintiff has been treated for depression. (Tr. at 335.) She cries a lot and does not like to be out in public. (Tr. at 335.) She has lost interest in doing anything. (Tr. at 336.) She has never been hospitalized for depression. (Tr. at 336.) She does not feel that she could live a normal life without medication because she does not want to be around people. (Tr. at 336.) She never had problems with missing work because of depression or anxiety. (Tr. at 336.) She has never been to counseling and stated that the only medical professional who has recommended it has been her nurse practitioner, who suggested it approximately two months before the hearing. (Tr. at 352.)

Plaintiff does not feel that she could lift 10 pounds occasionally or frequently. (Tr. at 338.) In a work-like situation, she could lift perhaps 5 pounds, or 2 and a half. (Tr. at 338.) Plaintiff does not carry a purse, because if she starts to fall she has to be ready to catch herself. (Tr. at 338.) She does not lift skillets or anything at home. (Tr. at 338.) When her fiancé is home, he does that lifting for her. When he is not home, her sons

usually cook in the microwave. (Tr. at 339.) Five pounds is her limit for lifting because she cannot bend and stoop or squat to pick up more weight. (Tr. at 339.) If she tried to lift more weight, her knees would hurt and would not support her. (Tr. at 339.)

Plaintiff does not feel that she could walk and stand for a total of two hours in an eight-hour day with normal breaks. (Tr. at 339.) At home, plaintiff works for about five minutes at a time and then sits down, or has her sons do most of the work. (Tr. at 339.) In a day's time, she estimates that she stands and walks a total of one hour. (Tr. at 339.) She sits with her feet elevated most of the day, or lies down on the sofa. (Tr. at 340.) Se keeps her braces on if she is planning to get up and down much. (Tr. at 340.) When she lies down, she takes her braces off. (Tr. at 340.) Her braces help her, but even with the braces walking is a problem for her. (Tr. at 341.) She can walk approximately 50 to 100 feet before sitting. (Tr. at 341.) Her knees and hips prevent her from walking greater distances. (Tr. at 341.) She also has trouble sitting. (Tr. at 342.) Plaintiff's hips hurt her when she sits for long periods. (Tr. at 342.) She can sit approximately 5 or 10 minutes without discomfort, and then she will lie down and change positions frequently. (Tr. at 343.) Her hips and back start to hurt and her legs get stiff. (Tr. at 344.) When she does get up, her legs are wobbly and do not function properly. (Tr. at 344.)

Plaintiff's surgeries helped her knees for a while, but the pain came back. (Tr. at 341.) Her doctor said he could fix the tear, but he could not fix the cartilage or take the arthritis out. (Tr. at 341.) To relieve pain, plaintiff tries to adjust her body, and she takes pain pills and Tylenol. (Tr. at 341.) When it is especially bad, she borrows Motrin from a friend. (Tr. at 341.) Plaintiff states she is not addicted to any kind of drug. (Tr. at 342.)

She has trouble sleeping because of the pain. (Tr. at 342-44.) She takes warm baths and uses moist heat to relieve the pain. (Tr. at 344.)

Plaintiff's pain medication causes her stomach problems and makes her sick to her stomach. (Tr. at 346-47.) She takes antacid medication to treat those problems. (Tr. at 346.)

Plaintiff stated that her first orthopedic physician was Dr. McClain, who performed her first arthroscopy and gave her shots in her knees. (Tr. at 349.) She then went to see Dr. Duncan and was not pleased with him. (Tr. at 349.) He performed the surgery on her right knee. (Tr. at 349-50.) The last time she saw Dr. Duncan, he told her that the best thing for her to do was to be a couch potato. (Tr. at 350.) He said that the only thing he could do for her was tell her to be a couch potato. (Tr. at 350.) Plaintiff stated that she wanted to work and was too young to be a couch potato. (Tr. at 350.) She indicated that she had been given several shots in her legs, but that they did not work. (Tr. at 350.) Dr. Duncan also talked to plaintiff about having knee replacements. (Tr. at 350.) He said that she was too young for knee replacements. (Tr. at 351.) That was when plaintiff asked to go to another doctor. (Tr. at 351.) She had been treated since then by her nurse practitioner. (Tr. at 351.)

*2. Vocational Expert Terri Crawford*

Vocational Expert Terri Crawford testified at the request of the Administrative Law Judge. (Tr. at 353.) Plaintiff has worked in the past as a janitor, which is medium work, semi-skilled, performed at the medium exertional level; a cleaner/housekeeper, which is light work, unskilled, performed at the medium exertional level; and an electric motor assembler, light work, semi-skilled, performed at the medium exertional level. (Tr.

Case 6:04-cv-03208-REL   Document 13   Filed 05/02/05   Page 28 of 45

at 354-55.) Plaintiff's only transferable skill to sedentary work would be in assembly of semi-conductors. (Tr. at 355.)

The ALJ posed the following hypothetical: an individual aged 42, with the education and work history demonstrated in the evidence of record and as testified to at the hearing; functionally illiterate; and limitations in her ability to engage in work activity but with the following residual functional capacity: the ability to occasionally lift 10 pounds and to frequently lift 10 pounds; to stand or walk with normal breaks a total of two hours in an eight-hour workday; sit with normal breaks for a total of six hours in an eight our workday; pushing and pulling limitations and the use of hand or foot controls limited to the weight amounts above; can perform work requiring her to occasionally climb, balance, stoop, kneel, crouch, and crawl; no manipulative, visual, or communicative limitations; must avoid environmentally, concentrated exposure to vibration or to hazards, such as working with machinery or heights. Given these limitations, the individual would not be able to perform any of plaintiff's past relevant work. (Tr. at 355.) Plaintiff would be able to perform some sedentary, unskilled work, such as an optical assembler. (Tr. at 356.) There are 81,000 positions available nationwide and 1,500 in Missouri. (Tr. at 356.) Other sedentary, skilled positions include hand packager, which are classified in the Dictionary of Occupational Titles as medium work, unskilled, but which can be performed at the sedentary, unskilled level. There are 65,000 positions nationwide and 1,500 in Missouri.

If plaintiff could never perform work requiring her to stoop, kneel, crouch, or crawl, it would eliminate the hand packager, but it would still allow the assembler job. (Tr. at 357.)

The optical assembler job has a specific vocational preparation of 2, which includes any level of preparation beyond a short demonstration up to and including 30 days. (Tr. at 358.) The optical assembler job could be done with demonstration. (Tr. at 358.)

Plaintiff's attorney posed a hypothetical as follows: an individual 42 years old, functionally illiterate, with the ability to lift five pounds frequently, and five pounds occasionally. The individual would have the ability to stand or walk five minutes at a time before she has to sit, and to sit for 15 minutes at a time before needing to change positions. She could sit six hours in an eight-hour day and stand or walk for one hour in an eight-hour day. She could never balance, crawl, climb, or stoop. She is unable to stoop forward because of knee braces. She must avoid exposure to cold and vibration. She would have problems with manual dexterity because of carpal tunnel and would be limited to repetitive type use of both hands. Such an individual would be unable to perform plaintiff's past relevant work. (Tr. at 359.) Such an individual would be unable to perform any other type of work because she would be unable to complete an eight-hour day and would not have any bilateral manual dexterity. (Tr. at 359.) If the individual could sit for seven hours in an eight-hour day, she still would be unable to perform any work because of the limitation on the use of hands. (Tr. at 359.)

Plaintiff's attorney posed a second hypothetical assuming an ability to lift five pounds occasionally or frequently, stand or walk for 5 minutes at a time before sitting down, and sit for 15 minutes before changing positions. The individual would have problems with depression, crying, and being unable to concentrate because of the pain. She would be unable to walk more than 50 feet without sitting. She would be restricted to

absolutely no stooping or climbing, no vibration or cold. (Tr. at 359-60.) The individual would be unable to perform plaintiff's past relevant work and would be unable to perform any sedentary work because the sit/stand option would exceed employer tolerances. (Tr. at 360.)

Under the first hypothetical posed by the ALJ, if the individual had to miss three days per month because of pain in the knees, headaches, or depression, the individual would be unable to perform the duties of hand packager or assembler because the absences would exceed employer tolerances. (Tr. at 360.)

### V. FINDINGS OF THE ALJ

At step one of the sequential analysis, the ALJ found that plaintiff has not engaged in substantial gainful activity during the period under adjudication. (Tr. at 15.)

At step two, the ALJ found that plaintiff's disorders of the knees constitute severe impairments. He found, however, that plaintiff does not have a presumptively disabling impairment or combination of impairments meeting or equaling the clinical criteria of any listing. (Tr. at 15.)

In reaching this conclusion, the ALJ discussed the medical evidence of plaintiff's impairment, including her lengthy history of complaints of knee pain. (Tr. at 15.) The ALJ noted plaintiff's history of knee injuries, her various diagnoses of ligament tears and cartilage trauma, and her knee surgeries. (Tr. at 15.) He also reviewed plaintiff's history of seeking treatment for her condition, her responses to treatment, and her subjective statements to her physicians. (Tr. at 15-16.) He discussed plaintiff's complaints of depression and noted her reluctance and ultimate failure to seek treatment for those symptoms. (Tr. at 16-17.) The ALJ considered the opinion of the state non-examining

Case 6:04-cv-03208-REL   Document 13   Filed 05/02/05   Page 31 of 45

consultative medical expert, who stated that plaintiff retained the capacity to perform sedentary work, and the psychological expert, who opined that plaintiff had no severe mental impairment. (Tr. at 16.) The ALJ also reviewed plaintiff's self-reported activities of daily living, which included laundry and dishes, preparing simple meals, driving twenty miles once or twice a week, visiting her mother for two or three hours at a time, and attending church once a week. (Tr. at 17.) He found that her statements at the hearing and on the daily activities questionnaire reveal that plaintiff engages in a range of daily activities requiring considerable physical and mental exertion and are inconsistent with her allegation of disability. (Tr. at 17.)

The ALJ found plaintiff's allegations and subjective complaints to be not fully credible, citing the regulations and Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984). He noted her relatively solid earnings history for a number of years prior to her alleged onset date, but concluded that her allegations were not persuasive in light of the record as a whole. (Tr. at 17-18.) He found, specifically, that the medical records do not support plaintiff's allegation that she is disabled. (Tr. at 17.) No physician who has examined or treated plaintiff has opined that she is totally unable to work, and the surgical treatments of her knee injuries were evidently successful. (Tr. at 17.) Moreover, the successful surgical repair of her ligament tears, in the opinion of one doctor, made it more likely that steroid injections would relieve plaintiff's pain. (Tr. at 17.) In discussing plaintiff's allegations of depression, the ALJ concluded that, although she has been prescribed medication for depressive symptoms by her primary care physician, she has never required psychiatric or psychological treatment. The ALJ therefore concluded that her depression does not constitute a severe impairment. (Tr. at 17.)

The ALJ concluded that plaintiff has the following functional restrictions. She is functionally illiterate. She is able to lift, carry, push, and pull up to ten pounds. She is able to sit, with normal breaks, approximately six hours of an eight-hour work day. She is able to stand or walk, with normal breaks, approximately two hours of an eight-hour work day. She is able to perform occasional climbing, balancing, stooping, kneeling, crouching, and crawling. She is unable to perform work involving concentrated exposure to vibration or hazards such as unprotected heights or dangerous moving machinery. She has no manipulative, visual, or communicative limitations. (Tr. at 18.) Based on these restrictions, the ALJ concluded that plaintiff retains the capacity to work at the sedentary exertional level. (Tr. at 18.) All of plaintiff's past relevant work was performed at the light to medium exertional level. The ALJ therefore found that her impairment prevents her from performing any past relevant work. (Tr. at 18.) He found, however, based on the testimony of the vocational expert, that plaintiff has skills that are transferable to sedentary assembly work. (Tr. at 18.)

The ALJ found that Rule 201.23 of 20 C.F.R. Part 404, Subpart P, Appendix 2, indicates that an individual meeting plaintiff's profile is able to perform the jobs of which administrative notice has been taken at the sedentary exertional level. (Tr. at 18.) He found, further, that plaintiff is able to perform the job of optical assembler, which exists in significant numbers in the national economy. (Tr. at 18-19.) He therefore found plaintiff not disabled at any time through the date of his decision. (Tr. at 19.)

## VI. DISCUSSION

Plaintiff argues that the ALJ failed to properly assess plaintiff's credibility in light of the factors required to be considered under Polaski v. Heckler, 739 F.3d 1320 (8th Cir.

1984). She argues, further, that the ALJ erred in relying on vocational expert testimony that was inconsistent with the Dictionary of Occupational Titles. Thirdly, plaintiff argues the ALJ failed to find that plaintiff's obesity, in combination with her other impairments, met or equaled Listing 1.03 of the Listing of Impairments. Finally, plaintiff argues that the ALJ ignored the physical limitations imposed by plaintiff's carpal tunnel syndrome and DeQuervain's tenosynovitis, and erred by finding those impairments non-severe.

<u>A. CREDIBILITY OF PLAINTIFF</u>

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

*1. Consideration of Relevant Factors*

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. <u>Rautio v. Bowen</u>, 862 F.2d 176, 178 (8th Cir. 1988); <u>Benskin v. Bowen</u>, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. <u>Gray v. Apfel</u>, 192 F.3d 799, 803 (8th Cir. 1999); <u>McClees v. Shalala</u>, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. <u>Hall v. Chater</u>, 62 F.3d 220, 223 (8th Cir. 1995); <u>Robinson v. Sullivan</u>, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. <u>Robinson v. Sullivan</u>, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be

evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion.

### a. PRIOR WORK RECORD

The ALJ remarked that plaintiff had a relatively solid earnings history for several years prior to her alleged onset date. He nonetheless found plaintiff's allegations non-credible in light of the evidence in the record as a whole.

### b. DAILY ACTIVITIES

The ALJ discussed plaintiff's activities of daily living as reported at the hearing, as well as in the questionnaire submitted to Disability Determinations. He found that plaintiff engages in a range of daily activities requiring considerable physical and mental exertion, and that those activities were inconsistent with her allegation of disability. For example, the ALJ took note of plaintiff's admitted ability to care to her own personal needs and grooming, prepare simple meals, drive a car with automatic transmission twenty miles once or twice weekly, visit her mother for two or three hours at a time, and attend church weekly. Plaintiff also testified that, although most of the household chores are done by her fiancé and sons, she is able to do laundry and wash dishes. Also in the record, although not specifically discussed in the ALJ's decision, is the fact that plaintiff

was able to continue working for years after the onset of her symptoms and, in fact, performed substantially gainful activity until the day her factory employer put her on the night shift and increased the exertional demands of her work. The record reflects that she did not seek work after leaving the factory, not because she was physically unable to do so, but because she "had no drive to leave the house." Even so, she was reluctant to accept treatment for her depressive symptoms. Moreover, shortly before her alleged onset date, in July of 2002, plaintiff indicated to her treating source that her knee pain was worse that week because she was remodeling her kitchen. The substantial evidence of record reflects that, while plaintiff may lack the motivation to engage in many activities, she retains the ability to do so when she chooses.

### c. DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS

In discussing plaintiff's medical history, the ALJ noted that the surgical and medical treatment plaintiff received appeared to be effective, or were ineffective for some justifiable, medically determinable reason. He also made note of several lapses of time in which plaintiff evidently sought no treatment for her symptoms. Plaintiff alleges constant pain on a level of 9 out of 10 in both knees, an allegation not specifically mentioned or addressed by the ALJ. The ALJ did note, however, that plaintiff had received physical therapy and was discharged with "all goals achieved." It is worth mentioning that the primary goal of that therapy was to reduce plaintiff's pain from a 9 out of 10 to a 3 to 4 out of 10. Plaintiff also testified at the hearing that her knee braces were very helping in relieving the pain and pressure on her knees.

_d. PRECIPITATING AND AGGRAVATING FACTORS_

The ALJ did not specifically discuss precipitating and aggravating factors, but did note that the record reflects that plaintiff, on occasion, reported knee discomfort only with a lot of activity. The evidence of record also demonstrates that plaintiff's obesity is a contributing factor to her knee pain, as acknowledged by plaintiff herself. Plaintiff has made repeated statements to her treating sources that she would like to be able to exercise to lose weight and does, in fact, walk for exercise. Her doctors have made note of plaintiff's recognition of the fact that her lifestyle and diet contribute to her weight. She has been referred to a weight loss program and a low-fat diet, and advised to consider aquatic exercise. There is no indication that plaintiff has successfully implemented any lifestyle changes or low-impact exercise routine to address her obesity, or that plaintiff has tried to implement those changes but found them ineffective.

_e. DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION_

Plaintiff alleges that her pain medication causes her stomach problems, and states that the medication is inadequate to relieve her pain. The ALJ noted that plaintiff is prescribed medication to treat the stomach problems caused by her pain medication. Plaintiff has also been prescribed anti-inflammatory medication, as well as short-term narcotic and opiate drugs to address pain associated with plaintiff's surgeries or strenuous activities. The record is replete with references to the effectiveness of this medication regiment, when plaintiff follows it. Although the medication may never render plaintiff entirely pain free, plaintiff has on many occasions expressed satisfaction with the effectiveness of her prescribed drugs. Plaintiff has also received steroid injections and Synvisc injections in her knees. She currently alleges to the court and to her doctors that

those injections did nothing to relieve her pain. The office notes from her physician who administered those injections, however, indicate that plaintiff was extremely satisfied with the relief provided by the Synvisc injections in particular. She refused all future recommendations by her doctors that she take Synvisc injections, citing the ineffectiveness of the treatment. Her position regarding that treatment is not supported by the evidence of record, however.

### f. FUNCTIONAL RESTRICTIONS

The ALJ considered the effect of plaintiff's knee disorders in finding her functional restrictions, ultimately adopting the restrictions set by the medical consultative expert in the absence of any medical statement by a treating source. He considered her allegations of numbness and pain associated with carpal tunnel in her hands, and her allegations of depression and anxiety. He found, however, that those conditions, by plaintiff's own admission, had very little to no effect on her ability to perform substantial gainful activity.

### 2. Credibility Conclusion

The ALJ properly weighed the Polaski factors, above, against plaintiff's subjective complaints of disabling symptoms. Plaintiff's allegations of disabling physical limitations are inconsistent with both medical and non-medical evidence in the record, and substantial evidence in the record supports a finding that plaintiff's complaints are not fully credible. I therefore find that the ALJ did not err in concluding that plaintiff's allegations of disabling symptoms were not credible.

## B. VOCATIONAL EXPERT TESTIMONY

Plaintiff states that the ALJ erroneously relied upon vocational expert testimony which was flawed and inconsistent with the Dictionary of Occupational Titles (DOT), and therefore the decision at Step 5 of the sequential analysis was not based on substantial evidence of record. In response, the government states that the DOT gives a language factor of 1 for the job of Optical Assembler. A language factor of one requires an ability to read and recognize the meaning of 2,500 two- and three-syllable words; read at a rate of 95-120 words per minute; compare similarities and differences between words and between series of numbers; print simple sentences containing subject, verb, and object, and a series of numbers, names, and addresses; and speak simple sentences, using normal word order, and present and past tenses. This is the lowest level of language skills.

As the ALJ noted in the instant case, the Commissioner of Social Security has administratively noticed a class of jobs able to be performed by persons who are illiterate. The Medical-Vocational Guidelines specify a finding of "not disabled" for individuals aged 18 to 44, who are illiterate or unable to communicate in English, with no transferable skills, even when those individuals' maximum sustained work capacity is limited to sedentary work. 20 C.F.R. § 404, Rule 201.23.  The regulations state, however, that a finding of disabled may be appropriate in some cases where the individual does not have the ability to perform the full range of sedentary work. 20 C.F.R. § 404, Rule 201.00(h)(3).

> Whether an individual will be able to make an adjustment to other work
> requires an adjudicative assessment of factors such as the type and extent
> of the individual's limitations or restrictions and the extent of the erosion
> of the occupational base. It requires an individualized determination that

considers the impact of the limitations or restrictions on the number of sedentary, unskilled occupations or the total number of jobs to which the individual may be able to adjust, considering his or her age, education and work experience, including any transferable skills or education providing for direct entry into skilled work.

*Id*. The ALJ sought testimony from the vocational expert regarding plaintiff's transferable skills, which include some skills in assembly work.

The ALJ went beyond the Guidelines and elicited the testimony of a vocational expert, who testified that an individual with plaintiff's functional restrictions would be able to perform some sedentary, unskilled work. As an example of the type of work plaintiff would be able to perform, the vocational expert suggested the job of Optical Assembler, with an SVP of 2, allowing an individual to learn by demonstration. The ALJ and the vocational expert discussed plaintiff's functional illiteracy in connection with this job, and the vocational expert testified that plaintiff would not have to read to perform the job. Another example would be a Hand Packager, which is listed in the DOT as medium exertional level. The vocational expert testified, however, that there are some positions available that can be performed at the sedentary level.

The ALJ conceded that plaintiff was functionally illiterate and elicited testimony from the vocational expert to account for her limitations in reading and writing. This finding, however, will not defeat the ALJ's ultimate ruling when that ruling is supported by substantial evidence in the record. Plaintiff relies on a series of Eighth Circuit cases to support her proposition that reliance upon vocational expert testimony which conflicts with the DOT is reversible error. <u>See Porch v. Chater</u>, 115 F.3d 567, 571 (8th Cir. 1997), <u>Montgomery v. Chater</u>, 69 F.3d 273, 276-77 (8th Cir. 1996), <u>Smith v. Shalala</u>, 46 F.3d 45, 47 (8th Cir. 1995). These cases do not support the *per se* rule proposed by plaintiff,

however. The general rule is indeed that, where vocational expert testimony conflicts with the DOT, the DOT controls. Smith, 46 F.3d at 47. This presumption can be overcome, however, by eliciting testimony from the vocational expert that takes into consideration a claimant's particular limitations or explains how a particular job can be performed at a level not specified by the DOT. Porch, 115 F.3d at 571; Montgomery, 69 F.3d at 276-77. In this case, the ALJ and the vocational expert specifically discussed plaintiff's functional illiteracy and her ability to perform the jobs of Optical Assembler and Hand Packager notwithstanding such limitation.

Moreover, substantial evidence of record supports a finding that plaintiff is able to perform a job with a language factor of 1, as defined above. Although plaintiff stated that she could read only basic words like "the" and "and," she demonstrated her ability to read and understand much more than that by completing her Social Security application. Plaintiff testified that she copied her medication information from the prescription bottles, a skill in linguistic comparison that is specifically listed in the definition of the language factor of 1. She testified, further, that she would not be able to perform a job that required reading because she would not be able to read and understand people's names. Plaintiff points out in her brief that she had to have tests read to her in grade school. The educational records show, however, that the only tests that were read to plaintiff were the math tests. Plaintiff consistently performed well in history and other verbally-oriented subjects, and there is no indication in the record that she had tests read to her in those subjects. While the ALJ may have found plaintiff functionally illiterate, he did not define precisely what such a finding entailed. The substantial evidence of the

record is consistent with the ALJ's finding that plaintiff can perform a job with a language factor of 1.

### 3. CONSIDERATION OF PLAINTIFF'S OBESITY

Plaintiff next argues that the ALJ failed to consider plaintiff's obesity and failed to find that her obesity, in combination with her other impairments, met or equaled Listing 1.03.

As noted above, plaintiff's obesity is an aggravating factor in her knee disorder impairments. There is no indication in the record, however, that plaintiff's obesity in and of itself impaired her ability to perform work, or caused functional restrictions other than those related to her knee disorders. I find that the ALJ fully considered the functional limitations posed by plaintiff's knee disorders, which take into account the effect of plaintiff's obesity on her ability to perform substantially gainful activity.

Listing 1.03 requires that, after surgical arthrodesis of a major weight-bearing joint, there must be an inability to ambulate effectively or no return to effective ambulation within 12 months of onset. "Effective ambulation" is defined as an extreme limitation of the ability to walk. 20. C.F.R. § 404, app. 1, subpt. P § 1.00(B)(2)(b). This includes situations requiring the use of a hand-held assistive device limiting the functioning of both arms (i.e., a walker, two crutches, or two canes), the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to carry out routine ambulatory activities such as shopping or banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. *Id*. Plaintiff's own testimony does not support a finding of an inability to ambulate effectively, as she stated that she did not need assistive devices other than her knee braces, and that she was able to

Case 6:04-cv-03208-REL   Document 13   Filed 05/02/05   Page 42 of 45

walk from her car to the administrative hearing location. There is no medical evidence in the record supporting a finding that plaintiff's impairments, with or without considering her obesity, meet the requirements of Listing 1.03. The ALJ's finding that plaintiff's impairment does not meet or equal any of the listing requirements is therefore supported by substantial evidence of the record.

4. CONSIDERATION OF CARPAL TUNNEL AND TENOSYNOVITIS

Finally, plaintiff argues that the ALJ erred in finding plaintiff's carpal tunnel syndrome and DeQuervain's tenosynovitis non-severe. In fact, the ALJ questioned plaintiff regarding her symptoms related to these impairments, despite the fact that plaintiff only raised her hand problems as possibly contributing to her alleged disability at the administrative hearing. Nowhere in her application for disability benefits did plaintiff indicate that any hand problems or carpal tunnel syndrome contributed to her inability to perform substantially gainful activity. The evidence of record indicates that, more than two years prior to her alleged onset date, plaintiff was treated for carpal tunnel syndrome and tenosynovitis. After a total of four office visits and conservative treatment with a splint, steroid injections, and resting the joint, plaintiff reported that her condition was much improved and never again sought medical treatment for any hand complaints.

An impairment or combination of impairments is considered "not severe" when "medical evidence establishes only a slight abnormality… which would have no more than a minimal effect on an individual's… mental or physical ability to perform basic work activities." Social Security Ruling 85-28. Even if the ALJ had stopped at this step and not gone on to consider plaintiff's limitations in light of her severe impairment of the knees, there would be no reversible error. The medical record contains no evidence that

plaintiff's previously diagnosed carpal tunnel syndrome and tendonitis, which were in remission within weeks after their onset, contributed to her alleged disability more than two years later. Plaintiff alleged that she continued to experience numbness and pain in her hands, but the ALJ found her allegations to be not fully credible. In light of plaintiff's failure to seek any medical treatment for her alleged condition, her failure to mention the condition on her application for benefits, and her admission at the hearing that the condition only caused her to miss a few days of work, finding plaintiff's impairments of her hands non-severe was supported by substantial evidence of the record.

The ALJ did not stop at Step 2 of the sequential analysis, however. He went on to consider plaintiff's impairments through all five steps of the sequential analysis. In the absence of any treating source statement, the ALJ adopted the findings of functional limitations offered by the consultative expert. Therefore, even if the ALJ erred in finding plaintiff's carpal tunnel and tenosynovitis to be non-severe impairment, that error was rendered harmless by his subsequent evaluation. See Maziarz v. Secretary of Health & Human Services, 837 F.2d 240, 244 (6th Cir. 1987).

### VII. CONCLUSION

For all of the above reasons, I find that the ALJ did not commit reversible error as discussed above. I further find that substantial evidence in the record supports a finding that plaintiff is not disabled. It is therefore

ORDERED that plaintiff's claim is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.

/s/Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
May 2, 2005